# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70518-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| SAY SULIN KEODARA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant | ) | FILED: <u>November 2, 2015</u> |

SPEARMAN, C.J. — Seventeen-year-old Say Sulin Keodara was involved in a fatal shooting at a bus stop in 2011. He was apprehended for an unrelated incident and the police seized his cell phone. The State obtained a warrant to search the phone based on an officer's generalized statements about gang members commonly using their phones to take and store photos of illegal activity. Text messages and photos from the phone were submitted at trial. Keodara was convicted and sentenced to a standard range sentence of 831 months, based on the statutory presumptive minimum term for all charges. He appeals, arguing that the evidence from his phone should have been suppressed because the search warrant violated the Fourth Amendment to the United States Constitution and art. I, §7 of the Washington State Constitution. He also appeals his sentence, arguing that pursuant to <u>Miller v. Alabama</u>, ___ U.S. ___, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) it violates the Eighth Amendment to the United

States Constitution. He further argues that his counsel was ineffective for failing to assert this claim during his sentencing hearing.

We hold that although the search of Keodara's phone violated the federal constitution, the failure to suppress the evidence obtained thereby was harmless. We also hold that the sentence imposed below violated the constitutional mandate of Miller because the court failed to take into account Keodara's youth and other age-related factors. Accordingly, we affirm Keodara's conviction but remand for a new sentencing hearing.[1]

## FACTS

On September 12, 2011, a fatal shooting occurred at a bus stop on Rainier Avenue. Four people were inside the bus shelter located at the southwest corner of Rainier Avenue South and South McClellan Street. A vehicle pulled up and some Asian males, appearing to be in their teens or early twenties, asked the group if they were looking for any "soft." Verbatim Report of Proceedings (VRP) (May 8, 2013) at 135-36. "Soft" was known as a street term for crack cocaine. One of the persons inside the shelter, Victor Lee Parker, approached the vehicle and may have made a purchase. Parker then returned to the bus stop and the vehicle drove south on Rainier and then turned.

Later, three of the men from the vehicle approached the bus stop from the north on foot. One of them had a gun and demanded money from the group. The gunman fired on the group after one person tried to run. All four people were hit.

---

[1] In light of our resolution of this case, we do not address Keodara's claim of ineffective assistance of counsel.

2

Parker had been shot once and was lying on the ground when the shooter walked up to him and shot him in the head. Surveillance cameras from a nearby store showed images of a similar vehicle and of a man in a blue sleeveless jersey with writing on it.

The State arrested Keodara for an unrelated incident about five weeks after the shooting. On October 20, 2011, Renton police officers apprehended him in a silver, four-door Mitsubishi Galant. The car was impounded and the police obtained a warrant to search the car on October 21, 2011. In the car, the police found mushrooms in a bag belonging to the driver, other drug packaging paraphernalia, and a backpack containing a cell phone.

The police obtained a second warrant to search the cell phone. This warrant authorized search and seizure of the following:

> Stored phone contact numbers, all call history logs, all text messages, all picture messages, chat logs, voicemail messages, photographs, and information contained in any saved address databases or SIM cards within the cell phone, pictures, videos, a forensic image of the storage media, all documents, chat and internet activity and electronic data that identifies the owner or users of the cell phone.
>
> Any and all other evidence suggesting the crimes listed above [Assault in the Fourth Degree, Unlawful Possession of Firearms, Possession with Intent to Deliver or Sell Narcotics].

Clerk's Papers (CP) at 172.

The Affidavit in support of the warrant stated:

> I am the current Gang Information Officer for the Renton Police Department and a member of the South King County Violent Gang Initiative Task Force. I have been the Gang Information Officer since 2008 and a member of the Task Force since August of 2011. Prior to being employed by the Renton Police Department I was employed by the Department of Defense as a Detective where I

3

investigated gangs. I have attended and instructed gang training since 2002 for [a] total of over 500 hours. I have traveled around the Country attending gang conferences where I learn the current trends of gang members that are widely used. I am currently on the Board of Directors for the International Latino Gang Investigators Association. I have held this position since 2006 and prior to this position I was the regional representative for the Pacific Northwest. I have interviewed over 400 gang members and have identified over 100 gang members residing in the City of Renton, over the last 5 years.

It is this Officer's belief that there is significant evidence contained within the cell phone seized. Based off of my training and experience I know it to be common for gang members to take pictures of themselves where they pose with firearms. Gang members also take pictures of themselves prior to, and after they have committed gang related crimes. Additionally, it appears likely there is evidence of firearms contained within said electronic devices. I believe there is evidence of gang affiliation contained within their electronic devices, as this shooting was gang involved. Additionally, criminals often text each other or their buyers photographs of the drugs intended to be sold or recently purchased. Gang members will often take pictures of themselves or fellow gang members with their cell phones which show them using drugs.

CP at 175.

Keodara was charged several months later for the Rainier Avenue shooting after being identified from the surveillance video images. One of the victims, Sharon McMillon, described the gunman and later testified that the car in the video appeared to be the same one that stopped at the shelter, and that the person in the blue basketball jersey appeared to be the shooter. Keodara was also identified in the video by Lacana Long, who had dated Keodara in 2011.

Nathan Smallbeck told police that Keodara called him after the shooting and told him that he had "just shot at a bus station." VRP (May 13, 2013) at 34-35. He provided a statement to police about a call from Keodara around 3:18

4

a.m. and that he called Keodara later around 11:00 a.m. Id. at 36. The State presented Keodara's telephone records showing call records and texts from the day of the shooting. The State also obtained location data for Keodara's phone that showed it was in the area near the time of the shooting.

At trial, the State presented images from the phone that showed Keodara wearing clothing similar to that worn by the shooter, as well as text messages sent between him and Long. Keodara argued that the police lacked probable cause to search his phone and moved to suppress all evidence seized under the warrant. The trial court denied the motion without holding an evidentiary hearing.

Keodara was charged with and convicted of first degree murder and three counts of first degree assault, each with a separate firearm enhancement, and unlawful possession of a firearm in the first degree. The standard ranges for first degree murder and first degree assault were 312-416 months and 93-123 months, respectively, plus a deadly weapon enhancement of 60 months was added to each count. By statute, the terms for each count are required to be served consecutively and no good time is allowed on the deadly weapon enhancements. See RCW 9.94A.589(1)(b) and 9.94A.533(3)(e)). Defense counsel joined in the State's request that the trial court impose the presumptive minimum sentence for each count. The court did so, resulting in imposition of a total term of 831 months (69.25 years).

DISCUSSION

Search Warrant

Keodara argues that the warrant violated the particularity requirements of the Fourth Amendment of the United States Constitution and the protections of Article I, Section 7 of the Washington Constitution. According to him, the warrant was invalid because there was no specific nexus between the events alleged to have occurred and the items authorized to be searched. The State argues that the warrant was sufficiently particular because it specified the individual crimes for which evidence was being sought. The State also contends it would be unreasonable to impose additional limits on the scope of the search, because information related to firearms or drugs could be found any place on the phone and pertain to any time period.

We review the issuance of a search warrant under an abuse of discretion standard. State v. Maddox, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004). We give great deference to the magistrate or issuing judge's decision. State v. Cole, 128 Wn.2d 262, 286, 906 P.2d 925 (1995). We review de novo, however, the trial court's probable cause and particularity determinations on a motion to suppress. State v. Higgs, 177 Wn. App. 414, 426, 311 P.3d 1266 (2013) review denied, 179 Wn.2d 1024, 320 P.3d 719 (2014)).

A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003)). While the degree of particularity required depends on the nature of the materials sought and the facts of each case, we evaluate search

6

warrants "in a common sense, practical manner, rather than in a hypertechnical sense." State v. Perrone, 119 Wn.2d 538, 549, 834 P.2d 611 (1992) (citing United States v. Turner, 770 F.2d 1508, 1510 (9th Cir. 1985)).

"Conformance with the particularity requirement eliminates the danger of unlimited discretion in the executing officer's determination of what to seize." Perrone, 119 Wn.2d at 549 (citing United States v. Blakeney, 942 F.2d 1001, 1026 (6th Cir. 1991)). The underlying measure of adequacy in a description is whether, given the specificity of the warrant, a violation of personal rights is likely. State v. Reep, 161 Wn.2d 808, 814, 167 P.3d 1156 (2007). The fact that a warrant lists generic classifications, however, does not necessarily result in an impermissibly broad warrant. State v. Stenson, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997). But blanket inferences and generalities cannot substitute for the required showing of "reasonably specific 'underlying circumstances' that establish evidence of illegal activity will likely be found in the place to be searched in any particular case." State v. Thein, 138 Wn.2d 133, 147-48, 977 P.2d 582 (1999).

Keodara asks this court to consider the special nature of cell phones because of the amount of personal and private information that they contain. He cites a line of federal cases, including Riley v. California, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), revs'd and remanded, People v. Riley, 2015 WL 721254, Cal. App. Feb. 19, 2015)), and United States v. Galpin, 720 F.3d 436, 446 (2nd Cir. 2013), to support his argument that the vast potential for privacy violations requires increased sensitivity to the particularity requirement. In Riley, the United

States Supreme Court held that a warrant was required to search an individual's cell phone because of its potential to contain extensive personal information about "'the privacies of life.'" 134 S.Ct. at 2495 (quoting, Boyd v. United States, 116 U.S. 616, 625, 6 S. Ct. 524, 29 L.Ed. 746 (1886). Galpin involved the search of a personal computer, digital cameras, and digital storage devices for child pornography. The Galpin court held that the particularity requirement was of even greater importance, because advances in technology have "rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain." 720 F.3d at 446.

In general, Washington courts have recognized that the search of computers or other electronic storage devices gives rise to heightened particularity concerns. A properly issued warrant "distinguishes those items the State has probable cause to seize from those it does not," particularly for a search of computers or digital storage devices. State v. Askham, 120 Wn. App. 872, 879, 86 P.3d 1194 (2004). In Askham, the court held that the warrant was sufficiently particular because while it purported to seize a broad range of equipment, drives, disks, central processing units, and memory storage devices, it also specified which files and applications were to be searched. Id. It listed files related to the owner's use of specific websites, and files relating to manipulations of digital images and authorized the seizure of software related to manipulation of images, the defendant's handwriting, fingerprints, and postage stamps. Id. The warrant's description left no doubt as to which items were to be seized and was "not a license to rummage for any evidence of any crime." Id. at 880.

8

On the other hand, the warrant in State v. Griffith, 129 Wn. App. 482, 488-9, 120 P.3d 610 (2005), listed cameras, unprocessed film, computer processing units and electronic storage media, documents pertaining to internet accounts, videotapes, etc., as items to be searched. The supporting affidavit stated only that Griffith used a digital camera to take pictures of the victim and that he kept pictures on a computer; it did not contain evidence suggesting that Griffith uploaded pictures to the internet or that he used film or videotape. Id. The warrant was therefore overbroad because it permitted a search of video tapes and internet documents, neither of which had any connection to the alleged offenses.

Keodara argues that general statements about the ways dealers keep their drugs and their sales records are not enough to conclude that his phone contained evidence of illegal activity. In Thein, the affidavits in support of probable cause contained generalized statements of beliefs about the common habits of drug dealers. 138 Wn.2d at 138. The Supreme Court held that the search warrant for Thein's residence was overbroad, because the record showed no incriminating evidence linking drug activity to his home. Id. at 150. The Thein court held that the existence of probable cause is to be evaluated on a case-by-case basis and "'the facts stated, the inferences to be drawn, and the specificity required must fall within the ambit of reasonableness.'" Id. at 149 (quoting State v. Helmka, 86 Wn.2d 91, 93, 542 P.2d 115 (1975)).

The Thein affidavit read as follows:

> Based on my experience and training, as well as the corporate knowledge and experience of other fellow law enforcement

9

officers, I am aware that it is generally a common practice for drug traffickers to store at least a portion of their drug inventory and drug related paraphernalia in their common residences. It is generally a common practice for drug traffickers to maintain in their residences records relating to drug trafficking activities, including records maintained on personal computers. . . . Moreover, it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds of drug sales or to utilized [sic] to purchase controlled substances. . . . Evidence of such financial transactions and records related to incoming expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

I know from previous training and experiences that it is common practice for drug traffickers to maintain firearms, other weapons and ammunition in their residences for the purpose of protecting their drug inventory and drug proceeds[.] I am aware from my own experience and training that it is common practice for [sic] from law enforcement, but more commonly, from other drug traffickers who may attempt to "rip them off." Firearms and ammunition have been recovered in the majority of residence searches in the drug investigations in which I have been involved.

Thein at 138-39.

The affidavit for the warrant for Keodara's phone contained very similar blanket statements about what certain groups of offenders tend to do and what information they tend to store in particular places. Without evidence linking Keodara's use of his phone to any illicit activity, we find the affidavit to be insufficient under the Fourth Amendment. Under Thein, more is required for the necessary nexus than the mere possibility of finding records of criminal activity.

The State tries to distinguish this affidavit and warrant from Thein by citing officer Barfield's "wealth of specific experience and training." Brief of Respondent at 24. The Thein court, however, made no reference to the quality or quantity of the affiant's experience or whether such would suffice for an evidentiary nexus

10

between the evidence and the place to be searched. The blanket statements and broad generalizations are not particular to Keodara or his commission of any offense.

Furthermore, the warrant's language also allowed Keodara's phone to be searched for items that had no association with any criminal activity and for which there was no probable cause whatsoever. There was no limit on the topics of information for which the police could search. Nor did the warrant limit the search to information generated close in time to incidents for which the police had probable cause. The State argued that the warrant was sufficiently limited to search only for information related to specific crimes, such as evidence of possession with intent to sell drugs or possession of firearms or assault in the 4th degree. However, this is not sufficient under State v. Higgins, 136 Wn. App. 87, 92, 147 P.3d 649 (2006). In that case, we rejected the general description of "certain evidence of a crime, to-wit: 'Assault 2nd DV' RCW 9A.36.021." The court found that a general reference to evidence of domestic violence was not sufficiently particular, because the statute contained six different ways to commit the crime. Id. A warrant to search for evidence of any such violation would allow for seizure of items for which the State had no probable cause. Id. at 93.

Here, no evidence was seized that would have linked Keodara's phone to the crimes listed in the warrant--unlawful possession of firearms, possession with intent to deliver or sell narcotics, or assault. Nothing in the record suggests that anyone saw Keodara use the phone to make calls or take photos. In addition, the phone was found in a backpack, separate from the drug paraphernalia or the

pistol. There was no indication that evidence of firearms or drugs were found with the phone. We conclude that the warrant was overbroad and failed to satisfy the Fourth Amendment's particularity requirement.[2]

Keodara argues that because the warrant is invalid, all evidence from the phone should have been suppressed. Admission of evidence obtained in violation of either the federal or state constitution is an error of constitutional magnitude. State v. Contreras, 92 Wn. App. 307, 318, 966 P.2d 915 (1998) (citing State v. Mierz, 72 Wn. App. 783, 866 P.2d 65 (1994). An error of constitutional magnitude can be harmless "if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." State v. Jones, 168 Wn.2d 713, 724, 230 P.3d 576 (2010) (quoting State v. Smith, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)). Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. State v. Fraser, 170 Wn. App. 13, 23-24, 282 P.3d 152 (2012) (review denied, 176 Wn.2d 1022, 297 P.3d 708 (2013)). The appellate court looks only at the untainted evidence to determine if the totality is so overwhelming that it necessarily leads to a finding of guilt. Id. The State must show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Id.

---

[2] Keodara argues that the warrant is also invalid under the article I, section 7 of the Washington State Constitution. Because we find the warrant fails the federal constitutional requirements, we need not address the state constitutional issue.

The text messages and photos, while relevant, demonstrated only that Keodara knew Long, to which she testified, and that he commonly wore Hornets' jerseys. The fact that the shooter wore a Hornets' jersey was only one of many pieces of evidence that supported the State's case. Cf., State v. Wicker, 66 Wn. App. 409, 414, 832 P.2d 127 (1992) (error not harmless where fingerprints were the sole basis of the State's case and the jury received two opinions, one admitted in error). Here, the untainted evidence of Keodara's guilt was strong. Cellular phone tower records placed him near the location of the shooting, two eyewitnesses identified him, and another witness testified that Keodara contacted him and told him about the shooting. We find that the trial court's denial of Keodara's motion to suppress does not warrant reversal and, accordingly, we affirm his convictions.[3]

Sentence

Relying primarily on Miller v. Alabama, 132 S.Ct. 2455, Keodara argues that the sentence he received violates the Eighth Amendment. He points out that under Washington's sentencing scheme the crimes of which he was convicted, first degree murder and three counts of first degree assault, are deemed "serious

---

[3] Keodara also argues that his alleged gang affiliation and related activity also provide a basis to challenge the warrant's validity. He argues that participation in a gang is protected First Amendment activity that gives rise to a higher standard of protection from unreasonable search and seizure. The degree of particularity required by a search warrant is greater if it grants authority to seize materials arguably protected by the First Amendment. Perrone, 119 Wn.2d. at 547-48. Perrone held that items seized for their use in furthering criminal activity, such as illicit drug trade or illicit firearms, are not protected. Id. at 548. Here, because the warrant is invalid under the Fourth Amendment's particularity requirement, we need not address whether a search for information related to gang activity would require the higher level of particularity under the First Amendment.

violent offenses." See RCW 9.94A.030(45). Under RCW 9.94A.589(1)(b), the terms imposed for each such crime shall be served consecutively unless the court finds substantial and compelling reasons to depart from the presumptive standard range sentence. In Keodara's case, the application of the statute resulted in a sentence in excess of 69 years, which he contends is the equivalent of a mandatory life sentence without possibility of parole. Keodara argues that because he was a juvenile when he committed his crimes, Miller forbids the imposition of such a sentence unless the sentencing court considers his youth and individual circumstances. It is undisputed in this case that the court was not asked to and did not do so. Thus, Keodara contends the sentence is unconstitutional and that he is entitled to a new sentencing hearing.

The State argues that Keodara's reliance on Miller is misplaced because the length of his sentence is not attributable to a conviction for a single offense, but instead the cumulative result of consecutive sentences for separate crimes. The State also argues that even if Miller applies, the sentence is lawful because under RCW 9.94A.730(1) Keodara has a realistic opportunity for release after serving 20 years.

Miller is the latest of three United States Supreme Court cases that address the Eighth Amendment's prohibition against cruel and unusual punishment in the context of sentencing persons for crimes committed as juveniles. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the court held that the Eighth Amendment prohibited the imposition of the death penalty for defendants who committed their crimes before the age of 18. In

Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d. 825 (2010), the court held that the Eighth Amendment forbade the imposition of a life sentence on a juvenile offender who did not commit a homicide if there was no realistic opportunity for the offender to obtain release before the end of that term. And in Miller, the court concluded that mandatory sentencing schemes that require the imposition of life without parole sentences on juvenile offenders convicted of homicide are constitutionally impermissible unless the sentencer takes "into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller, 132 S.Ct. at 2469. The fundamental proposition underlying each of these decisions is "that children are constitutionally different from adults for purposes of sentencing." Id. at 2464. Thus, mandatory sentencing schemes that impose the same sentence on adults and juveniles without taking this critical distinction into account violate the "principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishments." Id. at 2475.

We recently rejected the State's argument that Miller should apply only to sentences of life without parole. In State v. Ronquillo, No. 71723-5-I (Wash. Ct. App. Oct. 26, 2015), we noted that Miller explicitly held that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." Id. slip opinion at 8 (quoting Miller, 132 S.Ct. at 2466). Accordingly, we found irrelevant the label given to the type of sentence, i.e., a life sentence or a term of years. The critical questions were whether a sentence to a term of years was the equivalent of a life sentence, and if so, whether it can be

mandatorily imposed on adults and juveniles alike regardless of the differences that we now know exist between them in terms of their culpability and capacity for rehabilitation. Id. slip opinion at 9. We determined that the term of years sentence in that case (52.5 years) was "a de facto life sentence" and concluded that before imposing it, Miller required the court to "'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" Id., (quoting Miller, 132 S.Ct. at 2469).

Keodara, like Ronquillo, was sentenced to a term of years that is equivalent to a life sentence without possibility of parole. Like Ronquillo, in imposing its sentence, the court did not take into account that Keodara was a juvenile at the time he committed the crimes or consider other age related factors that weigh on culpability or his capacity for rehabilitation. We conclude that the sentence imposed in this case contravenes Miller's constitutional mandate. Accordingly, we vacate his sentence and remand for a new sentencing hearing.[4]

## Statement of Additional Grounds

In his statement of additional grounds, Keodara objects to the trial court's evidentiary rulings regarding phone records and testimony about him possessing a weapon. We review a trial court's evidentiary rulings under an abuse of discretion standard. State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012).

---

[4] Ronquillo also rejected the State's argument that even if the sentence was unconstitutional when imposed, the issue is resolved by the enactment of RCW 9.94A.730(1) which provides juvenile offenders such as Keodara to petition for release after serving a minimum of 20 years. We held that the statute "'did not affect the mandatory nature of the sentence or cure the absence of a process of individualized sentencing considerations mandated under Miller.'" Ronquillo, slip opinion at 14 (quoting State v. Ragland, 836 N.W.2d 107, 119 (Iowa 2013)). We likewise reject the argument here.

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by testimony of a witness with knowledge that the evidence is what it is claimed to be. ER 901(a).

Keodara argues that cell phone records were not properly authenticated because the name on the records was "SYEO" and the texts and photos taken from his phone showed a different carrier. In this case Joseph Trawicki, records custodian for Sprint Nextel, testified about his familiarity with Sprint's records and the process by which call detail information is generated and recorded on the network for every subscriber. Trawicki testified that the phone records offered by the State included subscriber information, call detail records, and cell tower listings from 9/1/11 through 9/30/11, for telephone number 206-501-8354, registered to Syeo Keodara at 17028 105th Avenue South, Renton, Washington. Trawicki's testimony was therefore sufficient to authenticate the records and any question regarding whether the subscriber was Keodara was properly before the jury.

Keodara also argues that the phone records should not have been admitted because the State claimed that these records were from the wrong phone. In opening argument, the State maintained that the phone and the records were from the same number. After Trawicki's testimony and the testimony from Barfield about the phone, it was clear that the phone and the records corresponded to different numbers. The State recognized this in its closing argument. Keodara objects to the prosecutor's misstatement of the evidence, not its authentication. The jury, however, was instructed to remember

17

that the lawyers' statements were not evidence, and that it "must disregard any remark, statement, or argument that is not supported by the evidence or the law. . . ." CP at 262. The jury is presumed to have followed that instruction. State v. Warren, 165 Wn.2d 17, 29, 195 P.3d 940 (2008). Keodara has not shown that he was prejudiced by the prosecutor's misstatement and subsequent correction about the phone records and evidence.

Keodara also argues that it was error for the trial court to admit Smallbeck's testimony that he knew that Keodara possessed a nine millimeter (9 mm) weapon, which was the gun used in the shooting. Keodara argues that such evidence should have been excluded under ER 404(b). ER 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts to show character or to show action in conformity therewith. The test for admitting evidence under ER 404(b) consists of the trial court (1) finding by a preponderance of evidence that the misconduct occurred, (2) identifying the purpose for which the evidence is sought to be introduced, (3) determining whether the evidence is relevant to prove an element of the crime charged, and (4) weighing the probative value against the prejudicial effect. State v. Hartzell, 156 Wn. App. 918, 930, 237 P.3d 928 (2010) (citing State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995)).

The trial court engaged in the proper inquiry on the record; first finding that from the testimony and reports that Keodara was found with a 9mm at the time he was arrest. Second, the court found the evidence was offered to show that Keodara had access to such a weapon and that it was relevant to whether he committed the crimes charged. Finally, the trial court balanced the probative

18

No. 70518-1-I/19

value and the prejudicial effect when it stated on record that it would only admit evidence of Keodara having the 9mm prior to the shooting, not evidence of other guns or being convicted for possession of the 9mm at the time of his arrest. Keodara's ER 404(b) argument fails.

Finally, Keodara argues that the prosecutor committed misconduct by proffering Smallbeck's testimony about the time and occurrence of calls and texts back and forth with Keodara. He also argues that he received ineffective assistance of counsel because his attorney failed to object to such testimony. He claims that the records (the same records he claims were admitted in error because they had not been authenticated) clearly establish that no such calls occurred. The jury is entitled to weigh the evidence and determine the credibility of witnesses; we do not review such determinations on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Because the testimony was properly before the jury, we do not find that the prosecutor committed misconduct or that Keodara received ineffective assistance of counsel.

We affirm Keodara's conviction, but vacate his sentence and remand for resentencing in light of Miller and Ronquillo.

WE CONCUR:

19